IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, FRIENDS OF THE CLEARWATER, and WILDEARTH GUARDIANS,<br><br>             Plaintiffs,<br><br>       v.<br><br>C.L. "BUTCH" OTTER, Governor of Idaho, in his official capacity; VIRGIL MOORE, Director of the Idaho Department of Fish and Game, in his official capacity; BRAD CORKILL, FRED TREVEY, BOB BAROWSKY, MARK DOERR, RANDY BUDGE, KENNY ANDERSON, and WILL NAILLON, members of the Idaho Fish and Game Commission, in their official capacities,<br><br>             Defendants. | Case No.  1:14-CV-258-BLW<br><br>**MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment.  The Court heard oral argument on the motions, and took them under advisement.  For the reasons expressed below, the Court will grant in part and deny in part both motions.  The Court finds that plaintiffs are entitled to injunctive relief in the Panhandle and Clearwater Regions to protect the lynx from future incidental takes.  The Court will order the State to propose a plan to protect the lynx in those two Regions, and will urge the parties to work

together on drafting that plan.  The Court will deny any injunctive relief in the other five

Regions of the State.

## LITIGATION BACKGROUND

The Canada Lynx is listed as threatened under the Endangered Species Act (ESA).

Over the last three-and-a-half years, four lynx have been captured in Idaho with traps set

by trappers intending to lure other species.  Three of those four lynx were released alive

and the fourth was shot and killed by the trapper, thinking it was another species.

The plaintiffs – four environmental groups – allege that these captures of four lynx

violate the ESA.  They allege that Idaho's trapping regulations fail to sufficiently protect

the lynx, and that the Court should impose specific regulatory changes on trapping in

lynx habitat that would be more protective.  They have sued Governor Otter, Virgil

Moore, the Director of the Idaho Department of Fish and Game, and the members of the

Idaho Fish and Game Commission.

Both sides have filed motions for summary judgment.  Plaintiffs argue that as a

remedy for the ESA violation, the Court should ban traps that kill, restrict traps large

enough to capture the lynx, and require trappers to check their traps every 24 hours so

that lynx are released faster.  The defendants argue that (1) plaintiffs lack standing; (2)

three of the four lynx captures are exempt from the ESA because they were condoned by

an Incidental Take Statement issued by the Fish and Wildlife Service; (3) the defendants

are immune from suit; (4) the takings were the fault of the trappers, not the defendants;

and (5) plaintiffs have failed to show irreparable harm.

## FACTS

The lynx is a cat species whose range extends north through Canada into Alaska, and south into the northern regions of the contiguous United States.  Some of their best habitat is in the Northern Rockies/Cascade region – including a portion of Northern Idaho – but their population here remains small.

In 2000, the Fish and Wildlife Service (FWS) listed the Distinct Population Segment (DPS) of lynx in the contiguous United States as threatened with extinction. *See* 65 Fed. Reg. 16,052 (March 24, 2000).[1]  When the FWS initially proposed to list the lynx, it believed that the low numbers in the contiguous United States were due to "the residual effects of overtrapping that was believed to have occurred in the 1970s and 1980s. . . ."  *Id.* at 16,079.  But after receiving new information, the FWS concluded that "[w]e no longer believe that to be true."  *Id.* at 16,064.  The FWS now believes that the "[c]omparatively low numbers of lynx in the contiguous United States occur not as a result of overtrapping, but because lynx and their prey [snowshoe hares] are naturally limited by fragmented habitat, topography, and climate."  *Id.* at 16,077.

But even prior to this listing in 2000, states in the contiguous United States had restricted or closed lynx hunting seasons, and Idaho has prohibited the harvest of lynx since 1996.  These restrictions have had a beneficial effect.  The FWS concluded that "[m]ortality of lynx through legal trapping has been virtually eliminated in the contiguous United States, except in locations where Tribal regulations permit the taking of lynx."  *Id.*

---

[1] This listing was later clarified (68 Fed. Reg. 40,076 (July 3, 2003)) and codified (50 C.F.R. § 17.11).

**Memorandum Decision & Order – page 3**

at 16,077.  While the FWS recognized that trappers did accidently capture lynx when they were targeting other species, the agency concluded that this incidental capture had no negative effects on lynx populations because it was so infrequent.  *Id.*  The FWS noted that the lynx continued to persist throughout most of their historic range despite accidental captures.  *Id.* at 16,078.

In 2006, the FWS designated critical habitat for the lynx (70 Fed. Reg. 66,061 et seq.), revised those findings in 2009 (74 Fed. Reg. 8,616 et seq.), and revised them again in 2014 (79 Fed. Reg. 54,782 et seq.).  Critical habitat in Idaho consists of approximately 45 square miles in the extreme northeast corner of the State, bordering Canada and Montana.  In its 2014 revised critical habitat designation, FWS specifically rejected requests to expand critical habitat in Idaho southward.  *See* 79 Fed. Reg. at 54,818-20.  For example, USFWS stated the Clearwater and Nez Perce National Forests are not occupied by lynx populations and were likely not occupied at the time of listing.  *Id*. at 54,820.  The FWS found that these areas may occasionally host transient dispersing lynx, but the best available information indicates they do not contain the physical and biological features essential to lynx in adequate quantity or spatial arrangement on the landscape to support a lynx population over time. 79 Fed. Reg. at 54,818-20.

Under Idaho state law, all wild animals are considered property of the state.  *See Idaho Code* § 36-103(a).  In Idaho, it is illegal for anyone to "hunt, trap, or fish for or take any wild animal . . . without having first procured a license" to do so.  *Id.* § 36-

401. A licensed trapper is eligible to trap for all permissible species in all regions for which there is an open season. *See Idaho Admin. Code* §13.01.16.010.8. There is no open season for lynx in Idaho. *Id.* at §13.01.16.750.01.

Although it prohibits the hunting or trapping of lynx, Idaho does permit the trapping of other "furbearers," including bobcat, marten, mink, otter, beaver, muskrat, red fox, and badger. *Id.* at §13.01.16.010.01.a.-j. Trapping is also allowed for coyotes and wolves. The Idaho regulations do not prohibit trapping for these species in habitat shared by the lynx, and the listing decision by the FWS recognized that lynx may be inadvertently captured by traps meant for other furbearing animals. To avoid that, the FWS recommended that when trappers are setting traps in lynx habitat, they should "use a proper-sized foothold trap, such as #2 or #1.75 coilspring traps, which help discriminate against lynx captures due to the relatively small trap-jaw spread but remain efficient for bobcats, foxes, and coyotes." *See Exhibit I (Dkt. No. 77)* at 15.

Idaho has not adopted any laws that limit the types of traps that may be used in lynx habitat. *See Frost Declaration (Dkt. No. 58)* at ¶ 2, Ex. A at 11. The State allows trappers to use a variety of traps, including foothold (or "leghold") traps, conibear (or "killer" or "body-gripping") traps, and snares set in or on the land. *Idaho Admin. Code* at §13.01.16.010.05.a. Foothold traps are designed to capture and hold an animal by the foot, leg, or toe; the trap's two spring-powered metal jaws shut when an animal steps on a trigger. *See Niemeyer Declaration (Dkt. No. 56)* at ¶¶ 9-13. Conibear traps are made of two metal rectangular jaws hinged at the side, with a spring affixed to one or both sides; when an animal brushes a trigger, the jaws close like scissors on its body. *Id.* at ¶¶ 14-15.

A snare is a wire noose attached at one end to a stake or anchor; snares catch an animal either by the neck, the midsection of the body, or by the leg, and tighten around the animal as it struggles.  *Id.* at ¶¶ 17-19.

The State does not restrict how many traps or snares a licensed trapper may set each year.  *See Frost Declaration (Dkt. No. 58)* at ¶ 2, Ex. A at 11.  Trappers must visit their traps once every 72 hours, and remove any trapped wildlife.  *See Idaho Admin. Code* §13.01.16.200.01.a.  If a trapper traps a "non-target" animal such as a lynx, it must be "released immediately" if alive, and taken "into possession" if dead.  *Id.* at §13.01.16.200.03.  Trappers must notify IDFG if they trap a non-target species.  *Id.* at §13.01.16.200.03.b.iv.

Over the past two decades, the State has issued an increasing number of trapping licenses.  In the last decade, the number of licenses has risen from 1001 licenses for the 2005-2006 season to 2,364 licenses for the 2014-2015 season.

Between January 2012 and February 2014, there were four reported "takes" of lynx in Idaho.  On January 26, 2012, a trapper targeting bobcats trapped a lynx in a foothold trap in Lemhi County in the Salmon-Challis National Forest.  The trapper released the lynx alive, and notified the Idaho Department of Fish and Game (IDFG).

On December 29, 2012, a trapper targeting bobcats trapped a juvenile female lynx in a foothold trap in the Camp 9 Area in the Idaho Purcell Mountains in Boundary County.  He thought the lynx was a bobcat, and shot and killed it.  He notified IDFG, and he was cited for unlawfully possessing a lynx, to which he pled guilty.

On January 15, 2014, a trapper targeting wolves trapped a lynx in a foothold trap in the West Cabinet Mountains in Boundary County. The trapper released the lynx alive, and provided photographs of it to IDFG. *See Lucid Declaration (Dkt. No. 86-6)* at ¶¶ 12-14.

On January 27, 2014, a trapper targeting bobcats trapped a female lynx in a foothold trap in the Cabinet Mountains in Boundary County. The trapper notified IDFG, and Regional Wildlife Biologist Michael Lucid visited the trap site, placed a radio-collar on the lynx, and released it alive. *Id.* at ¶¶ 3-Id. ¶ 5, Ex. D at 2. The radio-collar transmitted data over the next 16 months, revealing that the lynx had a range of about 150 square kilometers. *Id.* at ¶ 9.

According to the FWS, it is unlikely that all incidental take of lynx is reported. In 2002, the Service considered effects on lynx of state-authorized bobcat trapping, and stated that it "anticipates that incidental take of lynx will be difficult to detect because there is little likelihood that trappers would report bycatch of lynx." *See Exhibit J (Dkt. No. 79)* at p. 13. The FWS estimates that for every reported incidental take of lynx, one incidental take remains unreported. *Id.* at 11.

The plaintiffs claim that the defendants have failed to impose protective regulations and thereby caused trappers to take lynx in violation of §9 of the ESA. In their summary judgment, the plaintiffs ask the Court to order the defendants to impose the following 3 requirements on Idaho trappers:

1.  Require that the inside diameter of foothold traps used in Lynx habitat be no greater than five and three-eighths inches.  A trap of this size (or smaller) will be too small to capture and hold a lynx.

2.  Require trappers to check their traps every 24 hours instead of the current rule requiring them to check every 72 hours.  Reducing the time spent in captivity will reduce the incident of injuries and the chance of harm to reproductive success. *See Vickers Declaration (Dkt. No. 57)* at ¶¶ 22-24.

3.  Ban conibear traps and neck snares in Lynx habitat.  These traps are designed to kill, and will most likely result in the death of any Lynx caught in such a trap.  *See Niemeyer Declaration, supra* at ¶25.

The plaintiffs ask the Court to impose these requirements on specific regions of Idaho where lynx may be present.  These requirements should continue, plaintiffs argue, until the State obtains an Incidental Take Permit (ITP) from the FWS.

## LEGAL STANDARDS

Based on a violation of the ESA, the Court may "enjoin any person, including . . . any [] governmental instrumentality . . . who is alleged to be in violation of any provision of this Act. . . ."  *See* 16 U.S.C. § 1540(g)(1).  To obtain the permanent injunction they seek, plaintiffs must show: (1) they have suffered or may suffer irreparable harm; (2) remedies such as damages are inadequate to compensate for their harm; (3) the balance of the parties' hardships warrants a remedy; and (4) the injunction is in the public interest. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010).

In general, environmental injuries are considered irreparable because they "seldom [can] be adequately remedied by money damages, and [are] often permanent or at least of long duration." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This does not mean that every environmental injury warrants injunctive relief; a plaintiff must still demonstrate that an irreparable injury is likely in the absence of an injunction. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). In ESA cases, the Ninth Circuit has found that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction." *Marbled Murrelet v. Pac. Lumber Co.,* 83 F.3d 1060, 1066 (9th Cir.1996). Proof of a threat of extinction to the species is not required, but a plaintiff must, at a bare minimum, establish a definitive threat of future harm based on something other than mere speculation. *Nat'l Wildlife Fed'n v. Burlington N. R.R*., 23 F.3d 1508, 1512 n. 8 (9th Cir.1994).

## ANALYSIS

In all four of the trapping incidents described above, the lynx was captured in a foothold trap. Three of the four captured lynx were released alive, and the fourth was killed by the trapper rather than the trap. Three of the four lynx captures were by Idaho-licensed bobcat trappers targeting bobcats.[2]

### **Takings Under the ESA**

The ESA states that a taking occurs if the protected animal is killed or trapped. *See* 16 U.S.C. §1532(19). Thus, the mere trapping of the lynx, even if released alive,

---

[2] The Court finds that the plaintiffs' Declarations adequately establish their standing, and so will not address this argument in the body of this decision.

**Memorandum Decision & Order – page 9**

constitutes a taking under §9 of the ESA.  *See Animal Welfare Inst. v. Martin,* 588

F.Supp.2d 70, (D.Me. 2008) (holding that "even if a lynx is harmlessly trapped, it has

been subject to a prohibited take under the [ESA]").  Moreover, the small numbers of

lynx affected here – 3 trapped and 1 killed – do not foreclose a finding that there has been

a taking under §9.  *See Defenders of Wildlife v. Bernal,* 204 F.3d 920, 925 (9th Cir. 2000)

(holding in §9 case that plaintiff must prove that building a new school "would more

likely than not harass a pygmy-owl by annoying it to such an extent as to disrupt its

normal behavioral patterns").  The Court therefore finds that the plaintiffs have

established four takings of lynx in violation of §9 of the ESA.

## **Causation**

Defendants argue, however, that it is the trappers and not any state actor who is

causing the taking.  It is true that the injury must be "fairly traceable to the challenged

action of the defendant and not the result of the independent action of some third party

not before the court."  *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d

1220, 1227 (9th Cir. 2008).  Here, each trapper must have a license granted and controlled

by the defendants.  Those licensed trappers have taken four lynx over the last three years,

and there is no evidence that they used anything other than legal traps permitted by the

terms of their licenses.  "[A] governmental third party pursuant to whose authority an

actor directly exacts a taking of an endangered species may be deemed to have violated

the provisions of the ESA."  *Strahan v. Coxe,* 127 F.3d 155, 163 (1st Cir. 1997).  In

resolving an identical issue involving a challenge to the trapping of lynx, another district

court has held that "the trappers conduct is not an independent intervening cause that

breaks the chain of causation between the [state] and the incidental takings of lynx."
*Animal Protection Institute v. Holsten,* 541 F.Supp.2d 1073 (D.Minn. 2008).  The Court
agrees with this analysis, and rejects defendants' argument that causation is lacking.

## Tenth Amendment

Defendants argue that this Court's power to order injunctive relief is limited by the
Tenth Amendment.  Specifically, they argue that the Tenth Amendment bars federal
action that essentially commandeers state governments into service of federal regulatory
purposes.  But this argument has been rejected by *Strahan,* 127 F.3d at 168-170, in an
analysis the Court finds persuasive.  In *Strahan*, the court found that there were takings of
a protected species and, based on that finding, directed the parties to meet together to
remedy that violation of the ESA.  Those findings are well within the broad authority
granted to the Court upon a finding of a violation of §9 of the ESA.  *Id.* at 170.  As will
be discussed further below, the remedy in this case is similar to that ordered in *Strahan.*
For all of these reasons, the Court rejects the Tenth Amendment argument raised by
defendants.

## Incidental Take Statement

The defendants argue that three of the four incidental captures of lynx by
licensed bobcat trappers cannot be deemed takings under §9 because they are exempt
under an Incidental Take Statement (ITS) issued by FWS.  That ITS was issued by the
FWS pursuant to the Convention on International Trade in Endangered Species of Wild
Fauna and Flora (CITES).  FWS has a duty under CITES to ensure that export levels of
the pelts of certain listed protected species will not be detrimental to the survival of the

**Memorandum Decision & Order – page 11**

species.  *See Fahey Declaration (Dkt. No. 86-2)* at ¶ 4.  CITES protects the lynx and the bobcat, among many other species.  *Id.*  If a state wants to export pelts of a species protected by CITES, the state can apply for approval of its program.  Idaho has applied to the FWS and been approved for the export of bobcat pelts under CITES.  *Id.* at ¶ 7.

In 2001, the FWS completed a Biological Opinion (BO) evaluating the effects of the FWS's regulation of the export of bobcat pelts.  *See Biological Opinion (Dkt. No. 79)*. More specifically, the BO examined whether the bobcat pelts were being legally acquired and whether their export would be detrimental to the survival of listed species such as the lynx.  *Id.*

The BO concluded that the export of bobcat pelts is not likely to jeopardize the continued existence of the contiguous United States DPS of the lynx.  *Id.*  In reaching that conclusion, the BO relied in part on the finding in the FWS's listing decision of 2000 that bobcat trapping "generally occurs outside of areas where lynx would be found, although we know that incidental capture occurs."  *Id.* at p. 10.  The BO went on to find that in the 20 years of the CITES Export Program, "there has been one bycatch of lynx reported" and predicted that the incidental capture of lynx in traps set for bobcat over the next ten years "would be uncommon."  *Id.*  That single incidental capture was in the 2000-2001 season when 7,500 bobcats were trapped, showing a very low ratio of incidental lynx captures.  *Id.*  The BO addressed the question whether lynx captures were going unreported, and concluded that it is not significant because lynx are generally not found where the bobcat trapping occurs.  *Id.* at pp. 10-11.  The final conclusion of the BO was that no more than 2 lynx would be killed and 2 injured over the next ten years, and that

**Memorandum Decision & Order – page 12**

this would not "significantly affect the listed lynx distinct population segment." *Id.* at p.

11.

The BO did, however, find that the trapping of bobcats would result in the

incidental injury or death of lynx. *Id.* at ¶ 11. The BO also found that a low level of

injury or death would not jeopardize the lynx and authorized the FWS to issue an

accompanying ITS exempting the take of two lynx by death and two lynx from injury

annually. *Id.* In 2012, the FWS re-evaluated the BO and found it to be still valid. *Id.* at

¶12.

Bridget Fahey, the Division Chief for Conservation and Classification for the FWS

has concluded that "the [FWS] considers the ITS to exempt take of Canada lynx that are

incidentally taken during state-licensed trapping targeting bobcats in Idaho." *Id*. at ¶ 20.

There is a strong indication in this record that 3 of the 4 lynx captures in Idaho were

incidentally taken during state-licensed trapping targeting bobcats because (1) those

trappers were each licensed to trap bobcats, and (2) they released the lynx they captured.

On these facts, it is reasonable to assume that the licensed trappers were targeting bobcats

rather than lynx. Thus, the facts fit Fahey's conclusion that the CITES ITS exempts lynx

incidentally taken in Idaho during licensed trapping targeting bobcats.

How much weight should the Court give to Fahey's interpretation of the CITES

IT? The answer to that question depends in part on whether Fahey has authority to speak

for the FWS. Typically the agency is a defendant and its litigation positions are deemed

to be the positions of the agency. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. 837 (1984). But here, the FWS is not a party and hence Fahey must

establish her authority to speak for the agency. Fahey is the Division Chief for

Conservation and Classification in the FWS's Headquarters Office. *See Fahey*

*Declaration, supra,* at ¶1. She was the lead FWS biologist re-evaluating the CITES BO

in 2007, *id.* at ¶11, and was appointed to lead the FWS's 2012 re-evaluation of the CITES

BO. *Id.* at ¶12. Certainly her long experience with the very issue before the Court means

that her reading of the CITES IT carries some weight. But until she establishes that her

interpretation is the FWS's interpretation, her testimony is more akin to that of an expert

than an agency representative. This makes a big difference. If Fahey is speaking on

behalf of the FWS, and her interpretation of the CITES IT is deemed an agency

interpretation, the Court must defer to it unless it is unreasonable. *Chevron, supra.* But

here she is merely speaking as an expert, and so her testimony is entitled to some weight

but not entitled to *Chevron* deference. The Court therefore cannot find that Fahey's

testimony definitively establishes that the 3 takings by bobcat licensed trappers are

exempt under the CITES IT.

The Court's concern with Fahey's reading that Idaho incidental takes are exempt

under the CITES ITS is that the ITS contains no limit on Idaho's incidental takes. There

is a nation-wide limit of 2 kills and 2 injuries, but there is no limit in Idaho or elsewhere

on captures when the lynx is released unharmed, which is clearly an incidental taking, as

discussed above. *See ITS (Dkt. No. 79).* Suppose that Idaho trappers report the capture

and release (unharmed) of, say, 3,000 lynx in a year. Under Fahey's reading, all 3,000

would be exempt under the CITES ITS. Such an interpretation would be unreasonable

and does not appear to align with the law: "An Incidental Take Statement that contains

no numerical cap on take and fails to explain why it does not" normally violates the ESA. *Center for Biological Diversity v. U.S. Bureau of Land Management,* 698 F.3d 1101, 1126-27 (9th Cir. 2012); *see also Klamath-Siskiyou Wildlands Center v. NOAA,* 2015 WL 1738309 at *14 (N.D.Cal. May 29, 2015) (evaluation of ITS setting limit of 83 incidental takings of northern spotted owl during applicant's logging operations).

It is true that the agency need not explain why there is no numerical cap when the "the impracticability of quantifying this take is self-evident." *Id.* at 1127. The CITES BO did find that bobcat trapping occurs mainly in areas not frequented by lynx, and that the ratio of 1 lynx captured for every 7,500 bobcats trapped demonstrates that incidental takes of lynx will be very infrequent. While this is important evidence for the irreparable harm analysis, set forth below, it does not make "self-evident" the "impracticability of quantifying this take" It remains practicable to set some limit – even a very low limit – on the incidental take of lynx in Idaho captured and released unharmed by trappers licensed to trap bobcats. Thus, Fahey's reading of the CITES ITS is not consistent with *Center for Biological Diversity.*

For these reasons, the Court cannot accept Fahey's reading of the CITES ITS. The Court therefore rejects defendants argument that the CITES ITS exempts the 3 incidental takes of lynx by trappers licensed to trap bobcats.

## Defendants' Immune?

The defendant argue that they are immune from suit under the Eleventh Amendment. The Court disagrees. The Eleventh Amendment prohibits federal courts from hearing lawsuits brought by citizens against state entities without the state's

consent. *Nat. Resources Def. Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 421 (9th Cir. 1996).  The *Ex parte Young* exception allows citizens to bring claims for declaratory and injunctive relief against state officials, sued in their official capacities, to enjoin ongoing violations of federal laws. *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000).  Plaintiffs are seeking injunctive and declaratory relief and thus fall within the *Ex Parte Young* exception.  Moreover, the defendants' additional claims of immunity have been resolved in *Strahan* and *Holsten* and the Court finds the analysis in those decisions to be persuasive.  *Strahan*, 127 F.3d at 163 (state agency director, among others, not immune from take suit); *Holsten,* 541 F. Supp. 2d at 1079 (holding that official who directs the state department in control of trapping of lynx in Minnesota is not immune from suit).  The Court will therefore reject defendants' argument that they are immune from suit.

## Irreparable Harm - Generally

The defendants argue that the plaintiffs must show more than just that future takings are likely but must also show that the "loss of those individuals would be significant for the species as a whole."  *Center for Environmental Science, Accuracy & Reliability v. Cowin*, 2015 WL 3797693 at *9 (E.D.Cal. June 18, 2015).  Defendants cite *Klamath-Siskiyou Wildlands Center v. NOAA*, 2015 WL 3466314 (N.D.Cal. May 29, 2015), which held that the loss of 12 protected northern spotted owls in past logging operations was not sufficient to warrant a finding that the logging operation under review would result in irreparable harm in the absence of evidence that it was significant to the species as a whole.

**Memorandum Decision & Order – page 16**

These cases are not persuasive, however, because they were not brought under §9 of the ESA.  The defendants cite no §9 case at the Circuit level holding that plaintiffs have the burden of showing that the likely loss of individual species would be significant for the species as a whole.  Indeed, the law in this Circuit appears otherwise:

> We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps. However, what we require is a definitive threat of future harm to protected species, not mere speculation.

*National Wildlife Federation v. Burlington Northern Railroad,* 23 F.3d 1508, 1512 at n. 8 (9th Cir. 1994).  In that case, brought under §9 of the ESA, the Circuit required that "the plaintiff must make a showing that a violation of the ESA is at least likely in the future." *Id.* at 1511.  The Circuit held that "[w]hile we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently *likely*." *Id.* (emphasis in original).  *See also Defenders of Wildlife v. Bernal,* 204 F,3d 920, 925 (9th Cir. 2000) (holding "that a reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA").

In accord with this Circuit authority, the Court holds that in order for plaintiffs to satisfy the irreparable harm prong of the injunction test, they "must make a showing that a violation of the ESA is at least likely in the future." *National Wildlife,* 23 F.3d 1508, 1512 at n. 8.  The Court will not require plaintiffs to show a significant threat to the species as a whole.

The plaintiffs seek to impose regulatory changes on trapping throughout the State of Idaho.  Yet the existence of lynx and their habitat varies widely throughout the State. As discussed above, the timbered northern regions of the State with snow hare populations provide far better habitat for lynx than the southern regions.  Accordingly, the likelihood of incidental capture will vary depending on the region of the State under consideration.

The Idaho Department of Fish and Game (IDFG) has divided the State into Regions, and subdivided each Region into Game Management Units (GMUs).  Plaintiffs seek to impose regulatory changes in every Region but not in every GMU.  The Court will examine each Region, and each GMU under consideration, to determine if future incidental takes are likely.

**Irreparable Harm – By Region**

The northernmost Region is called the Panhandle Region.  Just south of that Region is the Clearwater Region.  These two Regions make up the northern portion of the State.  To the southeast of the Clearwater Region lies the Salmon Region, and to the south of that Region lies the Upper Snake Region.  The three Regions that form the southernmost part of the State are the Southeast Region, the Magic Valley Region, and the Southwest Region.

In each of these Regions, plaintiffs urge the Court to order the State to (1) modify the size of certain foothold traps; (2) ban the use of traps designed to kill; and (3) require trappers to check their traps every 24 hours instead of the currently required 72 hours. Plaintiffs ask the Court to impose these restrictions on all GMUs in the Panhandle,

Clearwater, and Salmon Regions as well as specified GMUs in other Regions as follows: the Southwest Region (GMUs 19A, 20A, 22, 23, 24, 25, 26, 31, 32, 32A, 33, 34, 35, and that portion of GMU 39 that lies north of the Middle Fork of the Boise River); the Magic Valley Region (GMUs 43, 44, 48, and 49); the Upper Snake Region (GMUs 50, 51, 58, 59, 59A,60, 61, 62, 62A, 65, 66, and 67); and the Southeast Region (GMUs 66A, 75, 76, 77, and 78).

To support this remedy, plaintiffs summarized lynx sightings in Idaho over the last 15 years from documents provided by defendants in discovery.  *See Santarsiere Declaration (Dkt. No. 65).*  According to that summary, there have been 80 lynx sightings in Idaho in the last 15 years.  Many of those sightings were accompanied by location coordinates that allowed plaintiffs to plot the sightings within specific GMUs.  *See Raichle Declaration (Dkt. No. 64).*  The Court will proceed to examine this record for each Region to determine whether plaintiffs have carried their burden of showing that future incidental takes are likely.

**Panhandle Region**

The Raichle map shows about 30 lynx sightings in this Region over the last 15 years.  *Id.*  Three of the four incidents where lynx were trapped and released, as discussed above, occurred in Boundary County, within the Panhandle Region.  In the 2014 FWS reassessment of critical habitat for the lynx, the FWS concluded that critical habitat existed in "a small portion of northeastern Idaho in portions of Boundary County . . . ."  *See 79 Fed.Reg. 54825.*  The FWS concluded that "[t]his area was occupied by lynx at

the time of listing and is currently occupied by the species," and further that lynx "are known to be widely distributed throughout this unit." *Id.*

Based on this record, the Court finds it likely that lynx will be taken in the future in the Panhandle Region through inadvertent trapping.  Accordingly, the Court finds that plaintiffs have satisfied the irreparable harm prong of the injunction test as to the Panhandle Region.

**<u>Clearwater Region</u>**

The Raichle map shows about 23 lynx sightings in this Region over the last 15 years. But none of the four incidents where lynx were incidentally trapped occurred in the Clearwater Region.  The IDFG's Regional Wildlife Biologist for the Clearwater Region – Joel Sauder, who has served in this position for over 12 years – states that since 2003, there have been only 4 verified lynx observations in the Clearwater Region. *See Sauder Declaration (Dkt. No. 86-9)* at ¶5.  By verified, he means proven by something other than the observer's opinion. *Id.*  Part of his job is to review reports of wildlife sightings, and he has found over the years that "most purported observations of lynx are unable to be confirmed and leave considerable room for doubt as to the true identification." *Id.* at ¶6. In his own 12 years of experience in the Clearwater Region, he has "not identified, nor seen any evidence of a persistent lynx population or any long-term resident individual lynx in the Clearwater Region." *Id.* at ¶ 8.  His conclusion is confirmed at least in part by the FWS's 2014 reexamination of critical habitat for lynx, which concluded that the lands in the Clearwater/Nez Perce National Forests (making up a large portion of the

Clearwater Region) "were likely not occupied by lynx at the time of listing and are not currently occupied by lynx populations."  79 Fed.Reg. 54818 (2014).

This record presents no evidence of a persistent lynx population in this Region. Nevertheless, the 23 sightings cannot be ignored.  Although Regional Wildlife Biologist Sauder points out that most of those sightings are unverified, the Clearwater Region is adjacent to the Panhandle Region where there is critical habitat and numerous undisputed sightings.  The record certainly supports an inference that lynx populations in the Panhandle Region cross over to the Clearwater Region.  Even if transitory, these lynx are exposed to incidental trapping in the Clearwater Region.  Consequently, the Court finds that it is likely that lynx will be incidentally trapped in the Clearwater Region in the future.  Thus, the plaintiffs have satisfied the irreparable harm prong of the injunction test for the Clearwater Region.

**Salmon Region**

Plaintiffs seek to impose their trapping regulations on all the GMUs within the Salmon Region.  The Raichle map shows only three sightings of lynx in the Salmon Region within the last 15 years.  Beth Waterbury, an IDFG Regional Wildlife Biologist working in the Salmon Region, describes the 2012 trapping and release of the lynx in the Salmon Region, one of the four incidents, discussed above, where lynx were inadvertently trapped, and the only one outside of the Panhandle Region.  *See Waterbury Declaration (Dkt. No. 86-7)* at ¶¶ 1-7.  She states that this is the only verified report of a lynx in the Salmon Region since 1991.  *Id.* at ¶ 9.  She describes a number of multi-year

surveys designed to determine if lynx were present, all of which failed to detect any lynx in the areas tested within the Salmon Region.  *Id.* at ¶¶ 11, 13, & 14.

This record cannot support a finding that it is likely that lynx will be inadvertently trapped in the Salmon Region in the future.  Accordingly, the Court finds that plaintiffs have not satisfied the irreparable harm prong of the injunction test for the Salmon Region.

## Upper Snake Region

The plaintiffs seek to impose their trapping changes on 12 of the GMUs in the Upper Snake Region (GMUs 50, 51, 58, 59, 59A, 60, 61, 62, 62A, 65, 66, and 67).  The Raichle map shows only 6 sightings of lynx in this Region in the last 15 years.  None of the four incidents of incidental trapping of lynx occurred in this Region.  The IDFG's Regional Wildlife Biologist for the Upper Snake Region – Robert Cavallaro, who has conducted lynx surveys in that area for over a decade – concludes that "individual lynx appear to have occurred sporadically and infrequently in the Upper Snake Region.  There are no records indicating a persistent lynx population in the Region during this timeframe [from 2000 to the present]."  *See Cavallaro Declaration (Dkt. No. 86-8)* at ¶9.  He also concludes that "[t]hree of the six reported lynx observations on the spreadsheet exhibit to Ms. Santarsiere's declaration are in fact from Wyoming and not Idaho."  *Id.* at ¶ 7.  And he notes that "[o]f the six records since 1999, only one is a verified Idaho occurrence of lynx in the Island Park area."  *Id.*

This record cannot support a finding that it is likely that lynx will be inadvertently trapped in the Upper Snake Region in the future.  Accordingly, the Court finds that

**Memorandum Decision & Order – page 22**

plaintiffs have not satisfied the irreparable harm prong of the injunction test for the Upper Snake Region.

**Southeast Region**

Plaintiffs seek to impose their trapping regulation changes on five GMUS in the Southeast Region (GMUs 66A, 75, 76, 77 & 78). The Raichle map shows that there have only been two sightings of lynx in this Region over the last 15 years. None of the four incidental trapping incidents occurred in this Region. Toby Boudreau, who worked in this Region for seven years – from 2005 to 2012 – first as a Wildlife Biologist and then as Regional Wildlife Manager, testified that the two sightings in this Region are unverified, and that "[h]abitat . . . is unsuitable for a persistent lynx population." *See Boudreau Declaration (Dkt. No. 86-5)* at ¶ 14.

This record cannot support a finding that it is likely that lynx will be inadvertently trapped in the Southeast Region in the future. Accordingly, the Court finds that plaintiffs have not satisfied the irreparable harm prong of the injunction test for the Southeast Region.

**Magic Valley Region**

The plaintiffs seek to impose their trapping changes on four of the GMUs in the Magic Valley Region (GMUs 43,44, 48, and 49). The Raichle map shows only one sighting of a lynx in the Magic Valley Region (in GMU 49) in the last 15 years. None of the four incidental trapping incidents occurred in this Region. The IDFG's Regional Supervisor for this Region – Toby Boudreau, an individual with long experience in trapping – concludes (1) that "the single report of lynx identified in the Magic Valley

Region is unverified," and (2) that habitat in the Magic Valley Region "is unsuitable for a persistent lynx population."  *See Boudreau Declaration (Dkt. No. 86-5)* at ¶14.

This record cannot support a finding that it is likely that lynx will be inadvertently trapped in the Magic Valley Region in the future.  Accordingly, the Court finds that plaintiffs have not satisfied the irreparable harm prong of the injunction test for the Magic Valley Region.

## Southwest Region

The plaintiffs seek to impose their trapping changes on 14 of the GMUs in the Southwest Region (GMUs 19A, 20A, 22, 23, 24, 25, 26, 31, 32, 32A, 33, 34, 35, and 39). There have been only 6 sightings of lynx in this Region in the last 15 years.  None of the four incidental take incidents occurred in this Region.  There is no evidence in the record of snowshoe hares or other beneficial habitat in this Region.

This record cannot support a finding that it is likely that lynx will be inadvertently trapped in the Southwest Region in the future.  Accordingly, the Court finds that plaintiffs have not satisfied the irreparable harm prong of the injunction test for the Southwest Region.

## Irreparable Harm – Conclusion

The plaintiffs have carried their burden of showing irreparable harm in the Panhandle and Clearwater Regions only.

## Remaining Requirements for Injunction

With regard to the second prong of the injunction test, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages . . ."  *California ex rel.*

*Lockyer v. U.S. Dept. of Agriculture,* 575 F.3d 999, 1020 (9th Cir. 2009).  With regard to the third and fourth prongs, "the balance of hardships and the public interest tip heavily in favor of protected species."  *National Wildlife,* 23 F.3d at 1511.  Accordingly, the Court finds that plaintiffs have satisfied all the elements necessary to be entitled to injunctive relief to protect the lynx from future incidental takes in the Panhandle and Clearwater Regions.

**<u>Injunction Terms</u>**

The Court finds that the proper course here is to order the defendants to propose a plan to protect the lynx in the Panhandle and Clearwater Regions from future incidental take.  The Court will give the defendants 90 days to submit that plan.  The plaintiffs will then have an opportunity to review, and if necessary to challenge, that plan.  Ideally, the parties may be able to meet together and propose a joint stipulated plan to the Court.  If not, the Court will determine the terms of the injunction.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the plaintiffs' motion for summary judgment (docket no. 55) is GRANTED IN PART AND DENIED IN PART.  The motion is granted to the extent it seeks injunctive relief to protect lynx from future incidental trapping in the Panhandle and Clearwater Regions of Idaho.  The defendants are directed to file with the Court within ninety (90) days from the date of this decision a plan to protect the lynx from future incidental takes in the Panhandle and Clearwater

Regions of Idaho.  The motion is denied to the extent it seeks similar relief in the other Regions of Idaho.

IT IS FURTHER ORDERED, that the defendants' motion for summary judgment (docket no. 83) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to block any injunctive relief in Regions other than the Panhandle and Clearwater Regions of Idaho.  It is denied to the extent it seeks any further relief.

IT IS FURTHER ORDERED, that intervenors' motion for summary judgment (docket no. 84) is MOOT.

IT IS FURTHER ORDERED, that the motion to file sur-reply (docket no. 99) is GRANTED, and the Court did examine the intervenor's reply (docket no. 101) and the State's reply (docket no. 102) as well.

DATED: January 8, 2016

B. Lynn Winmill
Chief Judge
United States District Court

**Memorandum Decision & Order – page 26**